STATE OF CONNECTICUT *v.* DAVID A. GIBBS
(SC 15943)

McDonald, C. J., and Borden, Palmer, Sullivan and Vertefeuille, Js.

Argued June 1—officially released September 19, 2000

*Martin Zeldis*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Michael E. O'Hare*, assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, and *Joan K. Alexander* and *John M. Massameno*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MCDONALD, C. J. After a jury trial, the defendant, David A. Gibbs, was convicted of two counts of murder in violation of General Statutes § 53a-54a,[1] and one

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

count of capital felony in violation of General Statutes § 53a-54b (8).[2] The trial court, *Spada, J.*, rendered judgment in accordance with the jury's verdict on the capital felony count only,[3] and, after the state withdrew its request for the death penalty, sentenced the defendant to life in prison without the possibility of release. The defendant appealed from that judgment directly to this court pursuant to General Statutes § 51-199 (b).[4]

On appeal, the defendant claims that the trial court improperly: (1) denied his constitutional challenge to

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[3] The trial court did not render judgment on either of the two murder counts, nor did it merge the defendant's convictions on those two counts into the capital felony conviction. The trial court did so in an attempt to comply with the law "as has been set out by our Supreme Court . . . ." Although the trial court did not cite to any particular case, the court most likely was referring to *State* v. *Chicano*, 216 Conn. 699, 721–25, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). In *Chicano*, we held that the defendant's rights under the double jeopardy clause were violated by his conviction of, and sentencing for, both felony murder and manslaughter in the first degree, inasmuch as the latter crime is a lesser included offense of the former crime. Id., 721. We therefore remanded the case with the direction that the defendant's manslaughter convictions be combined with his felony murder convictions, and that the sentences imposed for the manslaughter convictions be vacated. Id., 725.

In the context of possible future appellate events, we also noted in *Chicano* that "[i]f the felony murder convictions are later invalidated for any reason and the defect at issue does not affect the convictions for manslaughter in the first degree, the manslaughter convictions would be resuscitated and the defendant could be punished for those convictions." Id. The trial court in the present case also contemplated such a possibility. The court stated that "[i]n the event the Supreme Court finds that the two murders were not as a matter of law caused in the course of a single transaction, they can then dismiss [the capital felony count] and return [the two murder counts] back to this court for sentencing . . . ." We see no impropriety in the trial court's determination of this issue, and the defendant does not claim any in his appeal.

[4] General Statutes § 51-199 provides in relevant part: "(b) The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A

the jury array based on an alleged underrepresentation of Hispanic persons in the array; (2) denied his motion for a judgment of acquittal on the capital felony count based on the alleged failure of the state to prove beyond a reasonable doubt that the two murders took place in the course of a single transaction; (3) denied the defendant's oral motion to dismiss based on an alleged violation of his right to a speedy trial; and (4) violated the defendant's rights under the constitution of Connecticut by requiring that the jury be death-qualified prior to the guilt phase of the trial. We reject all of the defendant's claims and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant, a native of Jamaica, was romantically involved with one of the victims, Tania Ramsey. Until May, 1992, the defendant and Ramsey lived together in a condominium in Windsor, along with the other victim, Ramsey's mother, Carmen Fagan. Sometime in May, Ramsey went to Virginia to live with her stepsister, Tiedra Hutchings, while the defendant moved in with another girlfriend, Miriam Ortega, in South Windsor.

In December, 1991, a dispute began between the defendant, and Ramsey and Fagan, over the purchase price of the condominium that the three of them had been sharing. The defendant told Ortega that he had purchased the condominium, and that he wanted either the title to the unit, or repayment of the $50,000 that he claimed to have contributed to the purchase price. The defendant also told Ortega that if Ramsey and Fagan did not comply with his demands, he was going to "get them."

In early July, 1992, Ramsey returned to Connecticut and resumed living with Fagan at the condominium. At

felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

that time the defendant told a third girlfriend, Melissa Fox, that he still was very upset with Ramsey and Fagan over the $50,000. The defendant also told Fox that he was so upset with Ramsey and Fagan "that he was going to strangle [Fagan] and make [Ramsey] die by suffering slowly." The defendant also stated that he was going to kill Ramsey and Fagan on July 12, and that "the only way he would be happy is if [Ramsey and Fagan] were dead so that nobody could have his stuff."

On July 10, the defendant and Ortega drove to a store in Vernon, where the defendant purchased an aluminum baseball bat and some rope.[5] The defendant told Ortega that the bat was for a birthday party that he planned to attend. Later that evening, Ortega overheard a telephone conversation between the defendant and a person named "Bobby," in which the defendant stated, "I gotta do what I gotta do." After the conversation ended, the defendant placed the bat and the rope in a bag, and told Ortega that he was leaving for Jamaica on July 13.

On the night of July 11, the defendant went to the Windsor condominium that he had shared with Ramsey and Fagan. When he arrived, only Fagan was at home. The defendant and Fagan began to argue over the money that Ramsey and Fagan purportedly owed to him. When Fagan became frightened and started to run upstairs, the defendant, fearful that Fagan was going to call the police, pursued her and hit her over the head with the baseball bat that he had purchased the previous day. The defendant killed Fagan by striking her repeatedly over the head with the bat, until her skull was crushed and portions of her brain were exposed.

Ramsey returned to the condominium sometime on the morning of July 12 and asked the defendant where

---

[5] At trial, Ortega testified that the defendant had purchased electrical cord rather than rope. The police, however, recovered the receipt, which showed that the defendant had changed his mind at the register and had purchased rope.

Fagan was. The defendant told Ramsey that Fagan was dead, and then taunted her with a blood-soaked towel. The defendant then forced Ramsey to make several telephone calls to her stepmother, Helen Hutchings, and her stepsister, Tiedra Hutchings, during the morning and early afternoon of July 12. Prompted by the distress in Ramsey's voice during the last of these telephone conversations, Helen Hutchings and Tiedra Hutchings each drove to the condominium to check on Ramsey. Before they arrived, the defendant called Ortega to tell her that he had "not finished yet doing what I was supposed to do."

Tiedra Hutchings, who was the first to arrive at the condominium, honked her horn several times in order to alert Ramsey to her presence. In response, Ramsey came to the second floor window and made gestures indicating that someone else was in the condominium with her. Tiedra Hutchings then asked Ramsey to leave the condominium with her, but Ramsey refused, and told Tiedra Hutchings that she would call her later.

Concerned for Ramsey's safety, Tiedra Hutchings decided to call the police. As she was leaving to do so, Helen Hutchings arrived at the condominium, and Tiedra Hutchings told her that Ramsey was inside and in trouble. After Tiedra Hutchings and Helen Hutchings spent several minutes attempting to gain access to the condominium, Ramsey suddenly appeared at the front door, looking extremely scared and tired. When Helen Hutchings attempted to grab Ramsey's hand and pull her outside, the defendant pulled Ramsey back into the condominium. The defendant then took Ramsey into the upstairs bathroom, forced her to kneel in the bathtub, and slit her throat. As Ramsey continued to struggle for life, the defendant stabbed her again. Ramsey subsequently died of her injuries at Hartford Hospital.

Approximately five minutes after Ramsey had been pulled back into the condominium, the defendant left

carrying a duffel bag. He cursed at and insulted Tiedra Hutchings, and then walked to an automobile in the parking lot and drove away. The defendant drove to the Kentucky Fried Chicken restaurant on Farmington Avenue in Hartford, where a friend, Boris Delisser, worked. The defendant told Delisser that Ramsey and Fagan were dead, and that he had cut Ramsey's throat.[6] The defendant subsequently made similar statements to Ortega that included the details of both murders. Additional facts will be set forth as necessary in the course of the opinion.

I

The defendant first claims that the trial court improperly denied his constitutional challenge to the jury array. He claims that there was an underrepresentation of Hispanic persons in the array. The defendant contends that the jury array in the Hartford-New Britain judicial district,[7] as it was composed at the time of his trial, violated his constitutional rights to a jury made up of a fair cross section of the community; see *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); and to equal protection of the law; see *Castaneda* v. *Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977); owing to an underrepresentation of Hispanic persons.[8] The defendant also contends that General Statutes (Rev. to 1995) § 51-217 (a) (3),[9] which

---

[6] The defendant did not tell Delisser how Fagan had died.

[7] The Hartford-New Britain judicial district was split into the Hartford judicial district and the New Britain judicial district as of October 1, 1998.

[8] Although the defendant advances his fair cross section and equal protection claim under both the state and federal constitutions, he has not offered any meaningful analysis under the state constitution. We therefore will confine our discussion of those two claims to the relevant federal constitutional precedents. See *State* v. *Cobb*, 251 Conn. 285, 392 n.59, 743 A.2d 1 (1999).

[9] General Statutes (Rev. to 1995) § 51-217 provides in relevant part: "(a) All jurors shall be electors, or citizens of the United States who are residents of this state and listed in the records of the motor vehicle department as persons to whom motor vehicle operators' licenses have been issued, who have reached the age of eighteen. A person shall be disqualified to serve

disqualifies persons who do not speak English from serving on juries in Connecticut, violates his right to equal protection.

We recognize the importance of fairness in our judicial system, and particularly as to our jury selection procedures. The fair administration of justice depends on a jury selection system that is devoid of the systematic exclusion of any cognizable group. After careful scrutiny, we conclude that, in this case, the defendant's constitutional rights were not violated.

The following additional facts are relevant to the resolution of this issue. In March, 1996, the defendant filed a challenge to the jury array for his impending trial, in which he first alleged an unconstitutional underrepresentation of African-American and Hispanic persons in the jury array in the Hartford-New Britain judicial district. In December, 1997, the defendant filed amended challenges to the array, alleging only an underrepresentation of Hispanic persons. The trial court conducted extensive evidentiary hearings, and, in June, 1998, issued a lengthy memorandum of decision denying the defendant's challenge to the array.

In its memorandum, the trial court concluded that "the defendant has failed to state a prima facie case for a violation of the sixth amendment under *Duren* v. *Missouri*, [supra, 439 U.S. 357], or for a violation of equal protection under *Castaneda* v. *Partida*, [supra, 430 U.S. 482]. Even if the defendant had put forth a prima facie case, the evidence introduced by the state would clearly rebut the defendant's claims." The trial court found that the principal cause for any underrepresentation of Hispanic persons in the jury array was stale addresses resulting from population mobility, a phenomenon that is related to economic class, rather

as a juror if such person . . . (3) is not able to speak and understand the English language . . . ."

than ethnicity. Although such mobility exists among the Hispanic population, the trial court found that "[n]owhere is mobility a cachet *particular* to any distinctive or cognizable group. Ethnicity is irrelevant to the causes of mobility." (Emphasis added.)

A

As the parties stipulated, the relevant procedure for jury selection in Connecticut, set forth in General Statutes (Rev. to 1995) § 51-217 et seq.,[10] and summarized by the trial court, is as follows: "In Connecticut, the jury administrator prepares a master list from a larger pool of names called the source list annually for each judicial district. The voter list and motor vehicle list comprise the source list in effect at the pertinent time.[11] The master list is generated from town voter's registries and the state motor vehicle list of licensed drivers, minus the duplicates. . . .

"Based on the population of each town in the judicial district, the jury administrator advises town jury committees of the number of prospective jurors needed from the town. By January 1, the jury committees randomly select the required number of jurors from the list of registered voters in that town. The jury committee list is then compared to the list of licensed drivers in the state provided by the department of motor vehicles

[10] Connecticut's jury selection system, as set forth in General Statutes (Rev. to 1995) § 51-217 et seq., was modified by No. 96-179 of the 1996 Public Acts. The procedure to which the parties stipulated for purposes of the evidentiary hearing predated this modification, and therefore does not include any of the changes to the system made by Public Acts 1996, No. 96-179.

[11] Number 96-179, § 3, of the 1996 Public Acts expanded the sources for the source list to include, in addition to voter registries and motor vehicle registrants: (1) a list provided by the commissioner of revenue services of Connecticut residents who have a permanent place of abode, and who are subject to Connecticut's personal income tax; and (2) a list provided by the commissioner of labor of Connecticut residents who have received unemployment compensation.

and duplicate names are removed from the jury committee list. . . . Because the master list is pulled from the source list based on town population, it is referred to as a 'stratified' list.

"The jury administrator randomly selects a list of names of licensed drivers per town and merges this list with the list of names on the town's jury committee list to form a combined list for the town. The combined lists from each town in the judicial district are merged to form the master list for the district. . . . From the master list, names are randomly selected for jury service at courthouses within the judicial district based on anticipated requirements. A summons is sent by first class mail to the selected individuals directing them to appear at a certain courthouse on a certain day. The summons includes a list of statutory exemptions so that a potential juror can indicate a disqualification; those who do not claim an exemption must appear as summoned, although postponement for one year is available. Individuals who do not appear within a year of summons or postponement date are listed as delinquent. . . .

"If a summons is returned by the post office as undeliverable but contain[ing] a forwarding address, the summons is sent to the new address. If there is no forwarding address, no action is taken. . . . It should be noted that if a person fills out a card giving a forwarding address . . . the post office will forward first class mail free of charge for one year, and provide the sender with the forwarding address for the next six months. . . . Thus, there is an eighteen month period during which the summons will either be forwarded to the new address by the post office or sent to the new address by the jury administrator."

B

We consider first the defendant's fair cross section claim. The trial court concluded that the jury array

consisted of a fair cross section of the community. We agree.

Fair cross section claims are governed by a well established set of constitutional principles. "In order to establish a violation of his federal constitutional right to a jury drawn from a fair cross section of the community, the defendant must demonstrate the following: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren* v. *Missouri*, [supra, 439 U.S. 364] . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 450, 680 A.2d 147 (1996). "[I]n a fair cross section claim, the defendant need not prove intent. [S]ystematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (Internal quotation marks omitted.) *State* v. *Castonguay*, 194 Conn. 416, 421, 481 A.2d 56 (1984).

In this case, the defendant has satisfied the first prong of the test, in that Hispanic persons clearly comprise a distinctive group. See *State* v. *Gonzalez*, 206 Conn. 391, 396–97, 538 A.2d 210 (1988); *State* v. *Castonguay*, supra, 194 Conn. 424. Moreover, although the defendant is of Jamaican origin, identity with a group excluded from jury service is not a prerequisite to a party's fair cross section claim. See *Holland* v. *Illinois*, 493 U.S. 474, 476–77, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990). We turn, therefore, to the second prong of the test, namely, whether there was an underrepresentation of Hispanic persons in the jury array.

1

Courts traditionally have employed one of four statistical models in order to analyze the question of whether a particular group is underrepresented in a jury pool: (1) absolute disparity;[12] (2) comparative disparity;[13] (3) statistical decision theory;[14] or (4) sub-

[12] Absolute disparity "measures the difference between the percentage of the cognizable class in the population and the percentage of that group represented in the venire." *State* v. *Castonguay*, supra, 194 Conn. 428; see *United States* v. *Rioux*, 97 F.3d 648, 655 (2d Cir. 1996); *United States* v. *Sanchez-Lopez*, 879 F.2d 541, 547 (9th Cir. 1989). The absolute disparity model is disfavored, however, "when the percentage of persons in the group is small in relation to the entire population . . . [because] [t]he result obtained is a distortion of reality." *State* v. *Castonguay*, supra, 428; see *United States* v. *Rioux*, supra, 656 ("the absolute numbers/absolute disparity method [is] of questionable application when the minority population is a tiny percentage of the entire population"). In such instances, the absolute disparity method tends to be skewed erroneously against the finding of a substantial underrepresentation.

[13] Comparative disparity is calculated by subtracting the percentage of the cognizable group in the challenged jury pool from the percentage of the cognizable group in the relevant population, and then dividing that amount by the percentage of the cognizable group in the relevant population. *State* v. *Castonguay*, supra, 194 Conn. 429. Comparative disparity is designed, therefore, to measure "the *decreased likelihood* that members of an under-represented group will be called for jury service, in contrast to what their presence in the community suggests it should be." (Emphasis in original.) *United States* v. *Shinault*, 147 F.3d 1266, 1272 (10th Cir. 1998). This model is flawed, however, when the group to be measured constitutes a very small percentage of the general population, because it "tends to magnify the size of the disparity as the relevant group's percentage of the population decreases." *United States* v. *Haley*, 521 F. Sup. 290, 292 (N.D. Ga. 1981); see also *Thomas* v. *Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998) ("the comparative disparity test is strongly disfavored . . . on the ground that it exaggerates the effect of any deviation").

[14] Statistical decision theory "calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system." *United States* v. *Rioux*, 97 F.3d 648, 655 (2d Cir. 1996). This model, although useful in certain scenarios; see part I C of this opinion; is by definition inapposite to a selection process, such as Connecticut's jury selection system, that "entails reasoned disqualifications based on numerous factors"; *United States* v. *Rioux*, supra, 655; and there-

stantial impact.[15] In *State* v. *Castonguay*, supra, 194 Conn. 426, this court stated that "the choice of a statistical method depends on the facts and circumstances of each case." This court then adopted the substantial impact test as the proper model for the fair cross section claim; id., 430–31; and we subsequently reaffirmed that holding in *State* v. *McCarthy*, 197 Conn. 247, 250–52, 496 A.2d 513 (1985).

Whether the trial court adopted the proper statistical model is a question of law over which our review is plenary. See *State* v. *Webb*, 252 Conn. 128, 138, 750 A.2d 448 (2000). Although the substantial impact test has been adopted by only a small number of courts, we conclude that it is the proper method by which to analyze the defendant's fair cross section claim in the present case. Both the absolute disparity and comparative disparity models, although more widely used than the substantial impact test, are considered inaccurate when the distinctive group at issue represents a very small portion of the community; see *United States* v. *Rioux*, 97 F.3d 648, 656 (2d Cir. 1996); *Thomas* v. *Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998); and the statistical decision theory's focus on randomness is, by its very nature,

fore is *inherently* nonrandom. See *State* v. *Castonguay*, supra, 194 Conn. 427–28 (declining to adopt statistical decision theory model).

[15] The substantial impact test focuses on "whether the underrepresentation substantially affects the composition of the . . . jury." *State* v. *Castonguay*, supra, 194 Conn. 430; see *United States* v. *Test*, 550 F.2d 577, 589–90 (10th Cir. 1976). The substantial impact test begins with the percentage in the total population of the allegedly underrepresented group, and multiplies this figure by the number of persons in the jury array. This comparison yields the number of jurors from that group that should have been selected for jury service if the array mirrored accurately the percentage in the total population of the allegedly underrepresented group. This number is then compared to the number of persons from the group that *actually* were selected for the array. The difference between those two figures, namely, the *additional* number of jurors from the group that would be necessary to eliminate any underrepresentation, is then examined to determine whether it is "substantial." See *State* v. *Castonguay*, supra, 430; *United States* v. *Test*, supra, 590.

inapplicable to a concededly *nonrandom* process. In contrast, the substantial impact test measures underrepresentation "in terms of its impact on juries, not simply percentages in the abstract. This analysis allows the courts to reject challenges when the challenged practices did not significantly alter the composition of the typical grand or petit jury." (Internal quotation marks omitted.) *State* v. *McCarthy*, supra, 197 Conn. 251.

In the present case, the trial court properly concluded that the substantial impact test was the appropriate method by which to evaluate the defendant's fair cross section challenge. The trial court properly concluded that the statistical decision theory is inconsistent with Connecticut's jury selection process, and that because Hispanic persons comprised 6.57 percent of the adult population of the Hartford-New Britain judicial district, the Hispanic population is small enough, therefore, to render both absolute disparity and comparative disparity unreliable.[16]

2

Applying the substantial impact test, the trial court concluded that any underrepresentation did not amount to a constitutional violation. The trial court found that Hispanic persons comprised 6.57 percent of the adult

[16] The state and the defendant each propose an alternative statistical model for underrepresentation analysis. Each model is flawed, however, inasmuch as each ignores or skews certain factors in order to achieve a favorable result. The defendant's model, which he calls the "yield model," erroneously includes in its calculation factors that are *external* to Connecticut's jury selection process, and erroneously assumes that Hispanic persons and persons who are not Hispanic are similarly situated with regard to those external factors. The state's model, suggested as an alternative to the model used by the trial court, arbitrarily excludes any factor that the state characterizes as benign, and therefore nondiscriminatory, without offering any cogent rationale for the exclusions. As *neither* model finds any support in case law from any other jurisdiction, we decline to adopt either as the proper method for measuring underrepresentation.

population of the Hartford-New Britain judicial district, but constituted only 4.21 percent of those who respond to jury summonses.[17] Therefore, under the substantial impact test, approximately three (2.36) Hispanic persons would have to be added to every jury array of 100 persons in order to eliminate any underrepresentation. We conclude that this does not represent a substantial underrepresentation, and that the defendant has failed, therefore, to satisfy the second prong of the *Duren* test.

Whether Hispanic persons were underrepresented in the jury array represents a mixed question of law and fact, under which "[w]e review the [trial] court's factual determinations relevant to the defendant's Sixth Amendment . . . challenge for clear error . . . but we review de novo the court's legal determination whether a prima facie violation of the fair cross section requirement has occurred." (Citation omitted.) *United States* v. *Shinault*, 147 F.3d 1266, 1271 (10th Cir. 1998); see *State* v. *Paz*, 118 Idaho 542, 548, 798 P.2d 1 (1990). In *State* v. *Castonguay*, supra, 194 Conn. 430, we concluded that an underrepresentation of "slightly more than one additional Hispanic" person for every other grand jury was not substantial within the meaning of *Duren*. Given grand juries consisting of eighteen persons; *State* v. *Castonguay*, supra, 430; this would have meant approximately three additional Hispanic persons per 100 grand jurors, almost exactly the same ratio at issue in the present case.

When confronted with similar numbers, other courts have echoed our conclusion in *Castonguay*. See *United*

---

[17] In the trial court, the defendant argued that slightly different population figures should have been utilized. In his brief to this court, however, the defendant admits that "[t]he various figures suggested vary only marginally *and do not consequentially affect the conclusions regarding the significance of the underrepresentation.*" (Emphasis added.) Given that statement, we conclude that the defendant has waived any challenge to the trial court's factual findings regarding the relevant population.

*States* v. *Test*, 550 F.2d 577, 590 (10th Cir. 1976) (two out of fifty insubstantial under *Duren*); *United States* v. *Goff*, 509 F.2d 825, 826 (5th Cir.), cert. denied, 423 U.S. 857, 96 S. Ct. 109, 46 L. Ed. 2d 83 (1975) (1.4 out of twenty-three insubstantial); *United States* v. *Jenkins*, 496 F.2d 57, 65 (2d Cir. 1974), cert. denied, 420 U.S. 925, 95 S. Ct. 1119, 43 L. Ed. 2d 394 (1975) (one out of sixty insubstantial); see also S. Beale, "Integrating Statistical Evidence and Legal Theory To Challenge the Selection of Grand and Petit Jurors," 46 Law & Contemp. Probs. 269, 280 (1983) ("[t]he courts that have applied the impact standard have generally concluded that the challenger failed to prove a sufficient disparity when proportionate minority representation would have added only one or two additional minority jurors to a typical grand or petit jury"). Moreover, although most courts have chosen to utilize the absolute disparity model, some of those courts also have analyzed underrepresentation in substantial impact terms, and have reached conclusions that support our resolution of this case. See *United States* v. *Rioux*, supra, 97 F.3d 658 (two or three out of 125 insubstantial); *United States* v. *Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990), cert. denied, 499 U.S. 904, 111 S. Ct. 1102, 113 L. Ed. 2d 213 (1991) (two out of sixty insubstantial).

We conclude that the slight underrepresentation alleged by the defendant simply fails to rise to the level of a constitutional violation. In *State* v. *Castonguay*, supra, 194 Conn. 431, we noted that "our jury system of necessity deals with living individuals rather than fractional percentage persons. Changes in the demographic composition of juries and jury panels can therefore only be made by the addition or deletion of one or more individuals. . . . [C]ourts have been mindful of this latter fact in concluding that only gross or marked disparities or substantial departures from a fair cross section of the community require judicial inter-

vention." (Internal quotation marks omitted.) Bearing that principle in mind, we cannot say that the facts of this case constitute so "gross" a disparity as to warrant action on our part.[18]

## C

We consider next the defendant's claim that the jury selection process violated his right to equal protection. The trial court concluded that Connecticut's jury selection procedures did not violate the equal protection clause. We agree.

An equal protection violation in jury selection procedures may be established by proof of "(1) underrepresentation of a recognizable group; (2) substantial underrepresentation over a significant period of time; and (3) a selection procedure susceptible to abuse or not racially neutral." *State* v. *Castonguay*, supra, 194 Conn. 421, citing *Castaneda* v. *Partida*, supra, 430 U.S. 494. Although the defendant is not Hispanic, he nevertheless has the requisite standing to challenge, on equal protection grounds, the systematic exclusion of Hispanic persons from the jury array. See *Powers* v. *Ohio*, 499 U.S. 400, 415–16, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). Our conclusion, in part I B of this opinion, that Hispanic persons constitute a distinctive group for fair cross section purposes, applies as well in the equal protection context. See *Castaneda* v. *Partida*, supra, 495; *State* v. *Gonzalez*, supra, 206 Conn. 396–97. The defendant, therefore, has satisfied the first prong of the test established in *Castaneda* v. *Partida*, supra, 494.

Although the second prong of *Castaneda*, namely, whether there is substantial underrepresentation over

---

[18] Because we conclude that the defendant has failed to satisfy the second prong of the *Duren* test, we do not address the trial court's conclusion that the defendant also failed to meet the third prong of the test, namely, that the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v. *Missouri*, supra, 439 U.S. 364.

a significant period of time; id.; is similar to the second prong of *Duren*, the United States Supreme Court traditionally has employed the statistical decision theory model, rather than the substantial impact test, in order to analyze equal protection challenges. See id., 496–97 n.17; *State* v. *Castonguay*, supra, 194 Conn. 427 (statistical decision theory "has gradually become the favored method of the United States Supreme Court in analyzing equal protection challenges to grand jury arrays"). The virtue of the statistical decision theory in an equal protection claim is its precision in determining the randomness or nonrandomness of the history of jury selection procedures over a substantial period of time. Although randomness is irrelevant to a fair cross section claim, it is relevant in the equal protection context because the third prong of *Castaneda* requires proof of discriminatory intent. *State* v. *Castonguay*, supra, 421.

In this case, the trial court rejected the statistical decision theory as the proper method for analyzing the defendant's equal protection claim. Even if we assume, without deciding, that, in this case, the statistical decision theory[19] is the appropriate model by which to ana-

---

[19] The statistical decision theory model "explains the probability that the disparity between the percentages of [the recognizable group] in the [general] population . . . and [the recognizable group] in the qualified pool and source list is a result of random chance." *Ramseur* v. *Beyer*, 983 F.2d 1215, 1232 (3d Cir. 1992), cert. denied, 508 U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993). Under this method, the possibility that this disparity occurred randomly is measured by multiplying the total number of slots in the jury array by the percentage of eligible members of the recognizable group in the community, multiplying that number by the percentage of eligible nonmembers of the recognizable group in the community, and then taking the square root of that final product. Id., 1232 n.17; see also M. Finkelstein, "The Application of Statistical Decision Theory to the Jury Discrimination Cases," 80 Harv. L. Rev. 338, 354–60 (1966). This last figure represents the standard deviation, that is, the range within which the percentage of persons from the recognizable group selected for the jury array could vary and still be the product of random chance, with the likelihood of random chance being the source of the deviation decreasing as the number of standard deviations increases. From that standard deviation one may then calculate the chance that an actual disparate percentage occurred randomly.

lyze underrepresentation in the equal protection context; see *Castaneda* v. *Partida,* supra, 430 U.S. 496–97 n.17; see also *Ramseur* v. *Beyer,* 983 F.2d 1215, 1231–32 (3d Cir. 1992), cert. denied, 508 U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993) (employing statistical decision theory model for equal protection claim); the defendant's claim nevertheless fails because he has failed to meet the third prong of the *Castaneda* test.

Even if we were to determine, under the statistical decision theory model, that the underrepresentation of Hispanics in the jury array was not the result of random selection, we conclude, in this case, that there was not "a selection procedure that is susceptible of abuse or is not racially neutral . . . ." *Castaneda* v. *Partida,* supra, 430 U.S. 494. In order to satisfy that third requirement of *Castaneda,* a defendant must demonstrate that the jury selection process "is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable"; *Smith* v. *Texas,* 311 U.S. 128, 131, 61 S. Ct. 164, 85 L. Ed. 84 (1940); or that "the State [has] . . . deliberately and systematically [denied] to members of [a] race the right to participate as jurors in the administration of justice." *Alexander* v. *Louisiana,* 405 U.S. 625, 628–29, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972).

In the present case, the defendant has produced no evidence that Connecticut's jury selection system is capable of "deliberately and systematically" denying Hispanic persons the opportunity to be selected for jury service by excluding them from jury arrays. Rather, the factors that the defendant *claims* as proof of discriminatory intent, for example, the use of outdated addresses, and the number of no-shows for jury service in the Hispanic community, clearly were shown to be the product either of random chance, or of factors *external* to the system. As the trial court found, there is a greater occurrence of undeliverable jury summonses and fail-

ures to report for jury service in the Hispanic community than in the general population, not as a result of racial discrimination, but in the main because of residential mobility and linguistic isolation. These facts do not show a "deliberate and systematic" denial of rights. See *State* v. *George*, 331 S.C. 342, 349–50, 503 S.E.2d 168 (1998). The jury array in this case clearly results from the nonrandom, but perfectly legitimate, reasons for which prospective jurors of *all* ethnicities are eliminated from the eventual array. We conclude, therefore, that the defendant has failed to establish that his equal protection rights were violated by the manner in which the jury array was drawn from the community.

### D

Finally, we address the defendant's claim that the English proficiency requirement of § 51-217 (a) (3) violates the equal protection clause. This argument is without merit.

"It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty." (Internal quotation marks omitted.) *Carter* v. *Jury Commission*, 396 U.S. 320, 332–33, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970).

Although an issue of first impression for this court, *every* other court that has confronted an English proficiency requirement for jurors has upheld the requirement as constitutional. See, e.g., *United States* v.

*Escobar-de Jesus*, 187 F.3d 148, 166 (1st Cir. 1999) (requirement "that jurors be able to speak the English language and be able to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form"); *United States* v. *Rioux*, supra, 97 F.3d 659 ("[t]he requirement that jurors speak English is unquestionably reasonable"); *People* v. *Lesara*, 206 Cal. App. 3d 1304, 1309, 254 Cal. Rptr. 417 (1988) ("[n]or is the exclusion of insufficient English-speaking citizens abhorrent to the democratic ideals of trial by jury" [internal quotation marks omitted]); *State* v. *Ji*, 251 Kan. 3, 9, 832 P.2d 1176 (1992) ("[j]urors must have a reasonable knowledge of the language in which the proceedings are conducted to enable them to perform their duties"); *State* v. *Comeaux*, 252 La. 481, 486, 211 So. 2d 620 (1968) ("[t]he requirement that a person be able to read and write the English language to be qualified for jury service is a reasonable and nondiscriminatory regulation"); *Commonwealth* v. *Tolentino*, 422 Mass. 515, 522 n.8, 663 N.E.2d 846 (1996) (" 'the requirement that conduct of judicial affairs be in English is both reasonable and important' "). Even those courts that have held that an English-only requirement systematically excludes a certain portion of the population nevertheless have concluded that "the overwhelming national interest served by the use of English in a United States court justifies conducting proceedings in the District of Puerto Rico in English and requiring jurors to be proficient in that language." (Internal quotation marks omitted.) *United States* v. *Flores-Rivera*, 56 F.3d 319, 326 (1st Cir. 1995); see also *United States* v. *Aponte-Suarez*, 905 F.2d 483, 492 (1st Cir. 1990); *United States* v. *Benmuhar*, 658 F.2d 14, 19 (1st Cir. 1981), cert. denied sub nom. *Nieves* v. *United States*, 457 U.S. 1117, 102 S. Ct. 2927, 73 L. Ed. 2d 1328 (1982).

In this case, even if we were to assume that § 51-217 (a) (3) substantially excludes a cognizable group from

jury service, the state's interest in ensuring that jurors are capable of understanding the judicial proceedings is compelling, and the English proficiency requirement is narrowly tailored to serve that interest. The enormous additional expense that the state would incur were it required to provide interpreters for jurors, and the impact on the functioning of the jury, particularly during deliberation, certainly represents a compelling state interest. The defendant's claim under the federal constitution therefore must fail.

Similarly unavailing is the defendant's claim under the state constitution. In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we set forth a six factor test for analyzing independent claims under the constitution of Connecticut.[20] The defendant has not established, under any of those six factors, that article first, § 20, as amended by article twenty-one of the amendments[21] of our state constitution provides greater protection in this situation than does the federal constitution. The defendant has not offered, for example, any convincing textual evidence of greater protection, nor has he provided any historical basis for his claim. Moreover, as discussed previously, the relevant precedents from both the federal courts and our sister states are uniformly unfavorable to the defendant's position. In addition, the defendant's reliance on § 51-217 (a) (1), which proscribes the exclusion from jury service of

[20] Those six factors are "(1) the textual approach . . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted.) *State* v. *Geisler*, supra, 222 Conn. 685.

[21] Article first, § 20, of the constitution of Connecticut, as amended by article twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

persons because of deafness or a hearing impairment, is misplaced. One of the fundamental tenets of any equal protection claim is a showing that the group allegedly being favored and the group allegedly being discriminated against are similarly situated. See *State* v. *Jason B.*, 248 Conn. 543, 559, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999). A person who is hearing impaired hardly is situated similarly to a person who does not speak English. Moreover, a hearing impaired juror may communicate with the other members of the jury, through the use of written notes, during deliberation without the need of a third party. We therefore conclude that the defendant's state constitutional right to equal protection was not violated by § 51-217 (a) (3).

## II

The defendant next claims that the trial court improperly denied his motion for a judgment of acquittal on the capital felony count based on the failure of the state to prove beyond a reasonable doubt that the two murders took place in the course of a single transaction. We disagree.

"It is axiomatic that the burden in criminal cases is on the prosecution to prove each essential element of the alleged crime beyond a reasonable doubt and that there is no burden on the defendant to prove his innocence. *State* v. *Gabriel*, 192 Conn. 405, 413, 473 A.2d 300 (1984); *State* v. *Anonymous*, 179 Conn. 516, 519, 427 A.2d 403 (1980); *State* v. *Jackson*, 176 Conn. 257, 258, 407 A.2d 948 (1978); see *Mullaney* v. *Wilbur*, 421 U.S. 684, 699–701, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." *State* v. *Morrill*, 193 Conn. 602, 608, 478 A.2d 994 (1984). In this case, the defendant was charged with having violated § 53a-54b (8), which provides that a person is guilty of a capital felony if that

person is convicted of the "murder of two or more persons at the same time or in the course of a single transaction . . . ." The state, therefore, bore the burden of proving, beyond a reasonable doubt, that the defendant: (1) murdered two or more persons; and (2) that those murders took place "at the same time or in the course of a single transaction . . . ." General Statutes § 53a-54b (8).

The evidence established that the defendant murdered two persons, and the state does not contend that the murders took place at the same time. The crucial issue, therefore, is whether the two murders occurred in the course of a single transaction. Our resolution of that issue involves a two part analysis. First, we must determine, as a matter of law, the proper construction of that phrase. We then must apply the construction to the evidence produced by the state at trial, and determine whether that evidence was sufficient to satisfy the state's burden of proof.

### A

We consider first the proper construction of the phrase "in the course of a single transaction," which is an issue of first impression for this court. The defendant argues that this language necessarily requires a temporal nexus between the multiple murders. The state contends that there need only be some nexus between the murders—that is, that the murders be connected by a common purpose or plan—in order to satisfy the statute's requirements. We agree with the state.

We review this issue according to well settled principles. "Statutory interpretation is a matter of law over which this court's review is plenary. . . . In construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circum-

stances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, 252 Conn. 79, 84, 743 A.2d 156 (1999). [A]lthough we recognize the fundamental principle that [penal] statutes are to be construed strictly, it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent. . . . *State* v. *Ledbetter*, 240 Conn. 317, 330, 692 A.2d 713 (1997)." (Internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 803, 750 A.2d 1037 (2000).

We begin our analysis with the words of the statute itself. The plain language of § 53a-54b (8) offers insight as to the legislature's intent. This language rebuts the defendant's contention that a temporal nexus between the murders is the dispositive factor in determining whether those murders took place in the course of a single transaction. Under § 53a-54b (8), multiple murders qualify for prosecution as a capital felony if those murders took place "at the same time," *or* "in the course of a single transaction . . . ." To construe the amount of time between the murders as alone controlling the issue of whether those murders took place in the course of a single transaction would render the first clause mere surplusage. "It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. . . . Accordingly, care must be taken to effectuate all provisions of the statute. . . . Moreover, statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Szymkiewicz*, 237 Conn. 613, 621, 678 A.2d 473 (1996). Were we to read the requirement of a temporal nexus into the phrase "in the course of a single transaction," we effectively

would be rendering meaningless the legislature's decision also to include, as an alternative, the phrase "at the same time" in § 53a-54b (8).

Other factors, moreover, compel our conclusion that, while a temporal nexus between multiple murders committed by a defendant may constitute a capital felony, such a temporal relationship is not an absolute prerequisite to prosecution under § 53a-54b (8). First, in *In re Michael B.*, 36 Conn. App. 364, 380, 650 A.2d 1251 (1994), the only case to interpret the meaning of § 53a-54b (8), the Appellate Court concluded that "[a] single transaction is a series of events with a temporal continuity *or clear connection.*" (Emphasis added; internal quotation marks omitted.) Although the court acknowledged the importance of time as an element in determining whether "the murders can be considered to have been committed in the course of a single transaction"; id., 379; it also noted that "[t]he phrase 'a single transaction' has also been interpreted . . . to mean a series of related but separate events . . . ." Id. That the relationship often is a temporal one, as was the case in *In re Michael B.*, does not categorically foreclose the possibility that a "clear connection" between the murders may be established by some other type of nexus.[22]

---

[22] We disagree with the defendant's attempt to distinguish *In re Michael B.*, supra, 36 Conn. App. 364, on the basis of the fact that the case arose out of a hearing to determine whether there was probable cause to transfer the case from juvenile court to adult court. The defendant notes that the Appellate Court stated that "[t]he quantum of evidence required to establish probable cause is less than that required to establish proof beyond a reasonable doubt at trial." Id., 371. That statement was made, however, in the context of a two step legal analysis that is analogous to that which exists in the present case. In *In re Michael B.*, supra, 364, the Appellate Court first had to construe the proper meaning of § 53a-54b (8). Once the court did so, it *then* had to apply that construction to the issue of probable cause. In the present case, we first must construe § 53a-54b (8), and *then* determine whether the evidence produced by the state was sufficient to sustain the defendant's conviction. We therefore may safely rely on the Appellate Court's analysis on the *first* issue, namely, statutory construction, without concerning ourselves with the lower quantum of proof required on the *second* issue.

This interpretation also finds support in several of this court's previous decisions. Although those cases do not directly address the proper construction of § 53a-54b (8), they do offer some insight into the most logical interpretation of the concept of a single transaction for capital felony purposes. In *State* v. *Cobb*, 251 Conn. 285, 387–89, 743 A.2d 1 (1999), we rejected a claim by the defendant that a temporal gap between the sexual assault and the homicide that he had perpetrated on his female victim prevented him from being prosecuted for a capital felony pursuant to § 53a-54b (7).[23] Although we declined to address the issue of whether the phrase "in the course of the commission of sexual assault in the first degree"; General Statutes § 53a-54b (7); includes a temporal element, we clearly based our decision on the existence of a *logical* nexus between the sexual assault and the subsequent murder, namely, the defendant's desire to eliminate a possible witness against him. *State* v. *Cobb*, supra, 388–89. Our holding was premised, therefore, on the idea that the phrase "in the course of" encompasses the notion of two discrete events that may be connected by a defendant's motive in initiating both events.

*State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), and *State* v. *Gomez*, 225 Conn. 347, 622 A.2d 1014 (1993), on which the defendant principally relies, are not to the contrary. Both cases involved kidnapping as the predicate crime: in *Ross*, as the underlying felony for a capital felony charge pursuant to § 53a-54b (5);[24] and in *Gomez*, as the underlying felony for a

---

[23] General Statutes § 53a-54b (7) provides that a person is guilty of a capital felony if that person is convicted of "murder committed in the course of the commission of sexual assault in the first degree . . . ."

[24] General Statutes § 53a-54b (5) provides that a person is guilty of a capital felony if that person is convicted of "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ."

felony murder charge pursuant to General Statutes § 53a-54c.[25] In *Ross* and *Gomez*, although we recognized that one possible interpretation of "[t]he phrase 'in the course of' focuses on the temporal relationship between the murder and the underlying felony"; *State* v. *Gomez*, supra, 352; we also recognized a nexus arising from the defendant's intent while committing certain crimes, in considering whether those crimes occurred in the course of a single transaction. See *State* v. *Ross*, supra, 202 ("[i]t bears emphasis that in this case we have a defendant who, in this state, intentionally committed two kidnappings with the contemporaneous intent to cause the death of his victims").[26]

---

[25] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in further-ance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[26] It is true, as the defendant notes, that kidnapping is a continuing crime; i.e., the crime begins when the victim is abducted, and continues until the victim either escapes, or is freed from the control of the kidnapper. According to the defendant, the continuing nature of kidnapping means that there always will be a temporal link between the kidnapping itself and any other crimes that occur in the course thereof, inasmuch as the kidnapping is occurring every second that the victim remains under the kidnapper's control. This characteristic of a kidnapping/murder is one, the defendant contends, that is not present in a multiple murder. Although we do not disagree with this assertion, the fact that a temporal link *may exist* between two crimes, as with a kidnapping/murder, is not the same as establishing that a temporal link is an *absolute requirement* for those crimes to have

We conclude that, although a temporal nexus between multiple murders committed by a defendant may constitute evidence that those murders took place in the course of a single transaction, such a temporal relationship is not an absolute prerequisite to prosecution under § 53a-54b (8). Rather, the nexus between multiple murders necessary to prove that those murders took place in the course of a single transaction also may be established by proof beyond a reasonable doubt that a defendant possessed a plan, motive or intent common to the murders. We conclude that such a construction clearly fulfills the legislature's intent in enacting § 53a-54b (8), and prevents an interpretation contrary to the well settled precepts of statutory interpretation.

B

Having delineated the proper construction of § 53a-54b (8) in the context of the facts of this case, we turn next to the defendant's claim that the evidence proffered by the state was insufficient to prove beyond a reasonable doubt that he committed the two murders in the course of a single transaction. We reject this claim.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the

occurred in the course of a single transaction. *Ross* and *Gomez* may stand for the proposition that the continuing nature of kidnapping is evidence of a nexus between the kidnapping and the subsequent death of the victim. It would distort their clear meaning, however, to conclude that such is the *only* means of proving such a nexus. See *State* v. *Ross*, supra, 230 Conn. 202 ("[w]ith that intent . . . [the defendant] killed the victims . . . [t]his case, therefore, demonstrates an overwhelming factual nexus between the crimes and Connecticut").

cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999)." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000).

In the present case, there was ample evidence from which the jury could have found a link between the murders of Fagan and Ramsey sufficient to satisfy the requirements of § 53a-54b (8). Viewing the evidence in the light most favorable to upholding the verdict, the jury reasonably could have concluded that the defendant's statements to Fox on July 8, that "he was going to strangle [Fagan] and make [Ramsey] die by suffering slowly," and that "the only way he would be happy is if [Ramsey and Fagan] were dead so that nobody could have his stuff," combined with his purchase, on July 10, of the baseball bat and rope with which he carried out the murders, demonstrated an intent and plan on the part of the defendant common to both murders.

This conclusion is supported by the defendant's description of the murders to Ortega. From that description, the jury reasonably could have inferred that the defendant had planned to murder both Ramsey and Fagan, and that when he arrived at the condominium and found only Fagan at home, he murdered her, and then laid in wait there for Ramsey in order to complete his plan to murder both women. The jury could have based this conclusion on the defendant's telephone call to Ortega from the condominium, in which he told her that he had "not finished yet doing what I was supposed

to do," and from his later description of the crime to Delisser.

The defendant points to the temporal gap between the two crimes. It is true that, even viewed in the light most favorable to sustaining the jury's verdict, the shortest possible amount of time that could have elapsed between the Fagan murder and the Ramsey murder was approximately seven and one-half hours. Such a lapse of time, although significant, did not require the jury to conclude that the two murders were not bound together by both the defendant's intent, and his plan for the execution of the crimes. We conclude, therefore, that the evidence proffered by the state was sufficient to meet its burden of proving each and every element of § 53a-54b (8) beyond a reasonable doubt.

## III

The defendant next claims that the trial court improperly denied his pro se oral motion to dismiss based on an alleged violation of his federal and state constitutional rights to a speedy trial. We disagree.

The following additional facts are relevant to the resolution of this issue. The defendant was arrested and incarcerated on February 8, 1993. As a result of various delays, including a backlog of murder cases on the jury docket in Hartford, and the unavailability of one of the defendant's two attorneys because of back surgery, the defendant's trial did not begin until December, 1997. On March 12, 1998, after jury selection had been completed, but before the start of the evidentiary portion of his trial, the defendant made a pro se oral motion to dismiss the charges based on a violation of his right to a speedy trial. The trial court granted the defendant permission to make the motion pro se after one of the defendant's attorneys, James McKay, stated that although he was "not going to stand in [the defendant's] way of expressing his concerns if he wishes to

do so at this point . . . I [do not] want to particularly become involved in a dialogue about the long history of the case which I think would be inappropriate."

Following the defendant's motion, McKay placed on the record some of the reasons for the lengthy delay. Those reasons included: his inability to prepare for this case because he was occupied with other trials; defense counsel's choice to pursue a challenge to the jury array; and the backlog of murder cases in his office. McKay also indicated that there were certain reasons for the delay that he was unable to discuss at a public hearing, and that it was his opinion that "the motion should appropriately be brought by the attorneys."

After listening to the defendant's arguments, the trial court denied his motion to dismiss. The court was cognizant of the lengthy period of time that had elapsed between the defendant's arrest and the commencement of his trial. Indeed, the court expressly stated that "[i]f there is some evidence that is no longer available to you because of [the] period of time in jail prior to your trial, then your lawyers will bring it to my attention, and I will examine it to see how we can balance any injustice that may have occurred to you because of your inability to secure a trial within a shorter period of time." The court concluded, however, that "there is no evidence . . . that any of the defendant's constitutional rights were violated notwithstanding his frustration over the delay in securing a trial."

Both the United States constitution and the constitution of Connecticut guarantee every criminal defendant the right to a speedy trial. See U.S. Const., amend. VI; Conn. Const., art. I, § 8. This guarantee protects against "unreasonable delay between formal accusation and trial [that would threaten] to produce more than one sort of harm, including oppressive pretrial incarceration, anxiety and concern of the accused, and the possi-

bility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." (Internal quotation marks omitted.) *Doggett* v. *United States*, 505 U.S. 647, 654, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1994). As important as those considerations are, however, we do not agree with the defendant, under the facts and circumstances of this case, that his right to a speedy trial was violated.

It is well settled that neither the federal constitution, nor the state constitution, guarantees a defendant the right to hybrid representation. See *McKaskle* v. *Wiggins*, 465 U.S. 168, 183, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (federal constitution); *State* v. *Gethers*, 197 Conn. 369, 393–94, 497 A.2d 408 (1985) (state constitution). In other words, a defendant *either* may exercise his right to be represented by counsel; *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); or his right to represent himself; *Faretta* v. *California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); but *he has no constitutional right to do both at the same time.* As we concluded in *State* v. *Gethers*, supra, 391, "a hybrid representation arrangement [is not] in any way consistent with or of assistance to the framers' original intent [in providing for the right to counsel]."

It is equally well settled that, having made the knowing, intelligent and voluntary choice to avail himself of the services of counsel, a defendant necessarily surrenders to that counsel the authority to make a wide range of strategic and tactical decisions regarding his case. See *Taylor* v. *Illinois*, 484 U.S. 400, 417–18, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); *Jones* v. *Barnes*, 463 U.S. 745, 751–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). Although a represented defendant does retain the absolute right to make a limited number of choices regarding

his case; see *Taylor* v. *Illinois*, supra, 418 n.24;[27] neither the United States Supreme Court, nor this court, has ever expanded that extremely narrow class to include the choice of whether to file a motion to dismiss for lack of a speedy trial. Indeed, such a choice clearly is one of the vast panoply of trial decisions for which one retains an experienced and competent attorney. See, e.g., *United States* v. *Washington*, 198 F.3d 721, 723 (8th Cir. 1999) (whether to request mistrial); *Sexton* v. *French*, 163 F.3d 874, 885 (4th Cir. 1998) (whether to file pretrial motion to suppress confession); *State* v. *Oswald*, 232 Wis. 2d 62, 95–96, 606 N.W.2d 207 (App. 1999) (whether to strike venireperson for cause); see also *State* v. *Santiago*, 245 Conn. 301, 315–16, 715 A.2d 1 (1998) (attorney may waive sixty day period for holding probable cause hearing without client's presence).

In this case, it is undisputed that the defendant made the conscious and voluntary choice to avail himself of the services of counsel. It similarly is undisputed that at no point during the entire pendency of his case did the defendant attempt to discharge his attorneys and proceed pro se.

The fact that the defendant's counsel did not join in the motion presented the court with a difficult situation. The defendant attempts to bolster his claim with the assertion that the record is unclear as to the reasons for his counsel's choice not to file the motion to dismiss. A fair reading of McKay's statements to the trial court, however, especially his acknowledgment that "there are events that I think are a matter of record that help to explain [the delay] *as well as other things that I don't think should be discussed*"; (emphasis added); as well as McKay's statement that were he to make further

[27] Those choices include whether to plead guilty or not guilty, whether to waive the right to a jury trial, whether to waive the right to be present at trial, and whether to take an appeal. *Taylor* v. *Illinois*, supra, 484 U.S. 418 n.24; *Jones* v. *Barnes*, supra, 463 U.S. 751.

comment, he might have to divulge "communications and involvement between us and the client," demonstrate that McKay's decision not to file a motion to dismiss very likely was tactical in nature. We conclude, therefore, that the defendant had no authority to make the motion pro se. Therefore, the trial court properly denied the defendant's motion.[28]

## IV

The defendant's final claim is that the trial court improperly allowed the jury to be death qualified prior to the guilt phase of his trial, in violation of his rights pursuant to article first, §§ 8 and 19, of the constitution of Connecticut.[29] Specifically, the defendant argues that: death qualification results in a jury that (1) is more "conviction prone" than a jury that is not death qualified; and (2) is not composed of a representative cross section of the community. We disagree that the state constitution supports such a claim.[30]

The process of death qualification involves the "questioning [of] venirepersons . . . about their beliefs

---

[28] The defendant's reliance on, inter alia, *Gaines* v. *Manson*, 194 Conn. 510, 522, 481 A.2d 1084 (1984), is misplaced. In *Gaines*, the defendants' successful claim of undue delay in the filing of appellate briefs was premised on the inability of an understaffed public defender's office "to insure that the appeals of indigent criminal defendants [were] handled in a timely fashion." Id. An unduly burdensome workload cannot be characterized as a "tactical" reason for a delay in the judicial process.

[29] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury. . . ."

Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate . . . . The right to question each juror individually by counsel shall be inviolate."

[30] Recognizing that the United States Supreme Court has held on several occasions that death qualification prior to the guilt phase of a capital trial does not violate the federal constitution; see *Morgan* v. *Illinois*, 504 U.S. 719, 729–34, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *Lockhart* v. *McCree*, 476 U.S. 162, 173, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986); the defendant raises this issue solely as a matter of state constitutional law.

regarding the death penalty, and excusing for cause those venirepersons whose opposition to the death penalty would interfere with the performance of their duties as jurors at the sentencing phase of the trial . . . ." *State* v. *Griffin*, 251 Conn. 671, 683, 741 A.2d 913 (1999). In *Griffin*, after thorough consideration under the six factor test set forth in *State* v. *Geisler*, supra, 222 Conn. 684–86, we rejected a claim identical to that raised by the defendant in the present case. *State* v. *Griffin*, supra, 683–709. It would serve no useful purpose to repeat that lengthy analysis here. We conclude, therefore, that the defendant's rights under the state constitution were not violated by the death qualification of the jury prior to the guilt phase of his trial.

The judgment is affirmed.

In this opinion the other justices concurred.