******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOSEPH SILVA
## (SC 20266)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 53a-54b (7)), a person is guilty of murder with special circumstances when such person is convicted of "murder of two or more persons at the same time or in the course of a single transaction" and was eighteen years of age or older at the time of the offense.

Convicted, after a jury trial, of the crime of murder with special circumstances in connection with the shooting deaths of A and J, the defendant appealed to this court, claiming, inter alia, that the trial court had incorrectly instructed the jury on the "in the course of a single transaction" element of murder with special circumstances, thereby relieving the state of its burden of proving that element beyond a reasonable doubt. On the night of the murders, the defendant, along with passengers O and R, drove around in the defendant's car looking for J, with whom the defendant had a feud. Upon finding J sitting in the driver's seat of A's car, the defendant stopped, exited his car, and walked toward J, who had exited A's car. When the defendant reached J, he shot him two times and then walked to A's car and fired multiple shots at A, who was seated in the front passenger seat. The operative information charged the defendant with having committed the murders in the course of a single transaction but not at the same time. At trial, the defendant presented a third-party culpability defense implicating O in the murders. Specifically, defense counsel argued during closing argument that only O had the motive, means and opportunity to murder A and J. The trial court instructed the jury, with respect to the "in the course of a single transaction" element of murder with special circumstances, that, to prove that element, the state was required to establish beyond a reasonable doubt either that there was a temporal nexus between the murders of A and J or that there was a plan, motive, or intent common to both murders. Defense counsel did not object to that instruction. *Held*:

1. The defendant did not implicitly waive his unpreserved claim of instructional error under *State* v. *Kitchens* (299 Conn. 447); although the trial court provided the parties with a copy of its revised jury charge and defense counsel did not object to the court's instruction on murder with special circumstances, that court, under the circumstances of this case, did not provide the parties with a meaningful opportunity to review a change that it had made to the instruction on the "in the course of a single transaction" element of murder with special circumstances prior to charging the jury.

2. The defendant could not prevail on his unpreserved claim that the trial court had incorrectly instructed the jury that, if it found that there was a temporal nexus between the two murders, it could find that the state had proven the "in the course of a single transaction" element: contrary to the defendant's assertion, this court did not hold in *State* v. *Gibbs* (254 Conn. 578) that evidence of a common plan, motive, or intent is required to prove that multiple murders occurred in the course of a single transaction but held that a temporal connection alone is sufficient to satisfy the "in the course of a single transaction" element and that, in the absence of a temporal connection, evidence of a common plan, motive, or intent is sufficient to demonstrate a clear connection between multiple murders and to establish that those murders occurred in the course of a single transaction; accordingly, the trial court properly instructed the jury that it could find the "in the course of a single transaction" element proven by evidence of a temporal nexus between the murders of A and J, and, therefore, the defendant's claim of instructional error failed under the third prong of *State* v. *Golding* (213 Conn. 233).

3. The trial court did not commit plain error by failing to provide the jury, sua sponte, with a special credibility instruction with respect to the testimony of O, who the defendant claimed was the actual perpetrator

of the murders of A and J, and, thus, had a strong motive to testify falsely against him: even if the defendant had requested such an instruction, it would not have been plain error for that court to have declined to provide it, as this court has not endorsed, let alone required, such an instruction; moreover, the trial court instructed the jury on O's credibility generally, and defense counsel, during cross-examination and closing argument, highlighted for the jury O's motivations for testifying falsely, including the defense's theory that O was the actual perpetrator of the murders.

4. The defendant could not prevail on his unpreserved claim that the trial court had violated his constitutional rights to counsel and to present a defense by precluding defense counsel from arguing during closing argument that the absence of testimony from V, O's best friend, created reasonable doubt: the trial court reasonably determined that defense counsel was making an improper missing witness argument rather than raising a significant issue or making appropriate comment about V's absence at trial to the extent that V's absence reflected on the weakness of the state's case, as V was not a witness to the murders of A and J and, thus, could not corroborate or dispute the version of events to which various witnesses testified, and there was ample testimony, without the need to discuss V's absence, from which defense counsel could argue to the jury that O had a stronger motive than the defendant, as well as the means and opportunity, to murder A and J; accordingly, the trial court reasonably exercised its discretion in limiting the scope of defense counsel's closing argument to prevent comment on facts that were not in evidence, and, therefore, the defendant's claim failed under the third prong of *Golding*.

Argued January 12—officially released July 15, 2021*

*Procedural History*

Substitute information charging the defendant with two counts of the crime of murder and one count of the crime of murder with special circumstances, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gold, J.*; verdict and judgment of guilty; thereafter, the court vacated the conviction of two counts of murder, and the defendant appealed to this court. *Affirmed.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Gail P. Hardy*, former state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. Following a jury trial, the defendant, Joseph Silva, was convicted of two counts of murder in violation of General Statutes § 53a-54a (a)[1] and one count of murder with special circumstances in violation of General Statutes § 53a-54b (7).[2] The trial court vacated the conviction on the murder counts[3] and imposed a mandatory sentence under General Statutes § 53a-35a (1) (B) of life imprisonment without the possibility of release on the murder with special circumstances count. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant claims that the trial court (1) incorrectly instructed the jury on the "in the course of a single transaction" element of murder with special circumstances, (2) improperly failed to provide the jury, sua sponte, with a special credibility instruction with respect to one of the state's witnesses, who the defendant claimed was the actual perpetrator of the murders, and (3) violated his state and federal constitutional rights to counsel and to present a defense by precluding defense counsel from making an argument in closing argument that the absence of testimony from a certain witness created reasonable doubt. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On May 16, 2016, the defendant shot and killed the victims, Joshua Cortez and Alysha Ocasio, at the intersection of Campfield Avenue and Cowles Street in Hartford. The defendant and Cortez had a preexisting feud due in part to the fact that, when Cortez worked for the defendant selling marijuana, he had sold customers fake marijuana, prompting customers to complain to the defendant, and because Cortez' friend, Juan Gomez, had had sex with Coraima Velez, with whom the defendant had a child, after Cortez introduced them to each other. As a result, on the night of May 16, 2016, the defendant, joined by passengers Kailei Opalacz, with whom he had been in an on-and-off relationship for several years, and Josue Rodriguez, his friend, drove his car around Hartford looking for Cortez. The defendant found Cortez sitting in the driver's seat of Ocasio's Honda Accord by the intersection of Campfield Avenue and Cowles Street. The defendant stopped and exited his car and walked toward Cortez, who had exited the Accord. When the defendant reached Cortez, he shot him twice, once in the face and once in the top of his head. The defendant then walked over to the driver's side of the Accord and fired multiple shots at Ocasio, who was seated in the front passenger seat.

After shooting the two victims, the defendant ran back to his car, climbed into the driver's seat, and said to Opalacz and Rodriguez, "That's how Joseph Silva does it" and "I can't believe I just did that . . . ." While

speeding away from the murder scene, on a sharp left turn, the front right wheel of the defendant's car detached, immobilizing the car. Opalacz called her best friend, Nyasia Villegas, and told her to come pick them up, which Villegas did immediately. Villegas then drove them to the home of the defendant's mother on Montrose Street in Hartford, where the defendant exited the car and hid the murder weapon under a pile of wood at the rear of the property. The group then drove to a Walmart store in Manchester, where the defendant bought a shirt and a pair of pants, which he changed into in the store's bathroom. During the drive to Walmart, the defendant described for the other passengers how he had killed Cortez and Ocasio. The defendant explained that, after he exited his car and approached Cortez, he said to Cortez, "what up, nigga, what up," before shooting him in the face. The defendant placed his fingers on Villegas' forehead to demonstrate how he shot Cortez in the head. The defendant then described how he then walked over to Ocasio's Accord, opened the door, and shot her in the chest.

On the way back from Walmart, the car was stopped and searched by Hartford police officers, and the passengers were taken to the Hartford police station for questioning. During questioning, Opalacz, Villegas, and Rodriguez all provided statements implicating the defendant in the victims' murders. The following morning, Hartford police officers searched the property of the defendant's mother and found the murder weapon where the defendant had concealed it the night before. The defendant was arrested and charged with two counts of murder and one count of murder with special circumstances.[4]

At trial, the defendant presented a third-party culpability defense implicating Opalacz, arguing that she, rather than he, had murdered the victims. Specifically, the defendant adduced evidence that Opalacz and Velez, the mother of his child, had engaged in an escalating feud for the defendant's affections and that Ocasio, Velez' best friend, Ocasio's boyfriend, Cortez, and Villegas had all become embroiled in that feud. As a result of the feud, a week or so before the murders, Velez' brother had smashed the rear window of Opalacz' Nissan Altima with a baseball bat and an unidentified individual threw a rock out of Ocasio's Accord toward Opalacz' Altima. In retaliation, Opalacz and Villegas drove to Ocasio's Accord, and Villegas fired a BB gun at it, damaging the rear, driver's side window. The defendant also elicited testimony from Villegas that the defendant and Opalacz each had paid one half of the purchase price for the murder weapon and that, on May 16, 2016, the night of the murders, Opalacz had held that weapon before leaving with the defendant and Rodriguez to drive around Hartford looking for Cortez. On the basis of this evidence, defense counsel argued during closing argument that Opalacz alone had the

motive, means, and opportunity to kill the victims. The jury rejected that defense and found the defendant guilty on all counts. The trial court thereafter rendered judgment in accordance with the jury's verdict, vacated the conviction on the murder counts; see footnote 3 of this opinion; and imposed a sentence of life imprisonment without the possibility of release. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims that the trial court (1) incorrectly instructed the jury that, if it found that there was a temporal nexus between the two murders, it could find that the state has proved the "in the course of a single transaction" element of murder with special circumstances, (2) improperly failed to provide the jury, sua sponte, with a special credibility instruction concerning Opalacz' testimony in light of the evidence implicating her in the victims' murders, and (3) violated his state and federal constitutional rights to counsel and to present a defense by precluding defense counsel from arguing in closing argument that Velez' absence as a witness at trial created reasonable doubt. Because the defendant's claims are unpreserved, he seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[5] or, alternatively, for plain error.[6] We conclude that the defendant's first and third claims are reviewable under *Golding* but that his second claim is reviewable only for plain error. For the reasons set forth hereinafter, we reject all three claims.

I

The defendant first claims that the trial court incorrectly instructed the jury as to the "in the course of a single transaction" element of murder with special circumstances, thereby relieving the state of its burden of proving that element beyond a reasonable doubt. Specifically, the defendant argues that, under § 53a-54b (7), the state can prosecute murder with special circumstances in one of two ways: (1) by proving that the murders took place at the same time, or (2) by proving that they took place in the course of a single transaction. The defendant further argues that, under *State* v. *Gibbs*, 254 Conn. 578, 606, 758 A.2d 327 (2000), the state cannot prove that the murders occurred in the course of a single transaction by evidence of a temporal connection alone but, rather, must establish that he "possessed a plan, motive, or intent common to [both] murders." (Internal quotation marks omitted.) Because the court instructed the jury that it could find the single transaction element proven by *either* evidence of a temporal connection *or* a common plan, motive, or intent, the defendant argues that the jury was misled and "almost certainly" chose to find the element satisfied by evidence of a temporal connection because that was "the easier, more direct route to con-

viction," which allowed the jurors to "avoid the difficult question" of the defendant's common motive or plan for killing both Cortez and Ocasio, or whether he even had such a common motive or plan. The defendant finally argues that, because the state charged him with murder of two people "in the course of a single transaction," rather than "at the same time," and because the jury was instructed that it could find him guilty on the basis of a temporal connection alone, "[t]he court's instructions on murder with special circumstances effectively enlarged count three of the information, allowing him to be convicted of a crime with which he had never been charged . . . ."

In response, the state argues that the defendant's claim fails under the third prong of *Golding* because (1) it was waived implicitly under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011),[7] and (2) the court's charge accurately instructed the jury that the single transaction element is proven by evidence of "some 'clear connection' or 'logical nexus' between the two [murders]," and, contrary to the defendant's assertion, evidence of either a temporal connection *or* a common plan, motive, or intent is sufficient to prove that element. Specifically, the state argues that, contrary to the assertion of the defendant, "the phrase, 'at the same time or in the course of a single transaction,' does not describe two conceptually distinct alternative acts but, rather, provides two different descriptions of the same prohibited conduct—the commission of multiple murders that are logically connected through time, place, motive, common plan, or a combination of many factors." We conclude that the defendant's claim is reviewable under *Golding* because the record is adequate and it is of constitutional magnitude. See, e.g., *State* v. *Floyd*, 253 Conn. 700, 706–707, 756 A.2d 799 (2000) (defendant's claim that trial court improperly instructed jury on essential elements of crime of accessory murder implicated his due process right to fair trial and, thus, satisfied second prong of *Golding*). We further conclude that, although the defendant did not waive his instructional error claim under *Kitchens*, he cannot prevail on that claim because the trial court correctly instructed the jury that it could find the single transaction element proven with evidence of a temporal connection between the victims' murders.

The following additional procedural history is relevant to this claim. On October 26, 2018, the third to last day of evidence, the court summarized on the record an in-chambers charging conference it had conducted with the parties earlier that day. During its summary, the court noted that the state's long form information charged the defendant with committing two murders only "in the course of a single transaction," not "at the same time," and that it would limit its instruction accordingly. On the afternoon of Saturday, October 27, 2018, the court sent the parties its proposed jury charge.

When trial reconvened on the following Monday, the court stated that, since sending the parties the proposed charge, it had made several changes to it and intended to discuss them with the parties during a free moment. For the remainder of that Monday, however, no such free moment presented itself, and the court did not provide the parties with a copy of its proposed changes. On the morning of Tuesday, October 30, the court provided the parties with a revised copy of a proposed jury charge containing its changes to the proposed charge it had sent the parties over the weekend. Prior to the court's morning recess, the state presented its final witness, the court read the parties' stipulations to the jury, and then the state rested. Thereafter, the defense made an oral motion for a judgment of acquittal, which the court denied, the defendant was canvassed on his decision not to testify, and then the defense rested. The court then took its morning recess, during which it discussed with the parties the changes it had made to its prior proposed jury charge. With respect to the instruction for murder with special circumstances, the court noted that, in defining the single transaction element, it had "augmented some of the language from the standard charge"[8] in accordance with *State* v. *Campbell*, 328 Conn. 444, 180 A.3d 882 (2018), which "indicates that to be in the course of a single transaction the state is required to prove it was *either* a temporal nexus, that is, a continuity between the two murders based on time, *or* a common plan, motive, or intent."[9] (Emphasis added.) After the morning recess, the parties presented their closing arguments, which were followed by the luncheon recess. The court invited the parties to review the changes it had made to its prior proposed charge during that luncheon recess.

Following the luncheon recess, the state made its rebuttal argument, followed immediately by the court's charge to the jury. When instructing the jury on the single transaction element of murder with special circumstances, the court stated: "The second element of murder with special circumstances is that . . . two murders . . . occurred in the course of a single transaction. . . . [I]n order to prove that the two murders occurred in the course of a single transaction, the state must prove beyond a reasonable doubt *either* that there was a temporal nexus between the murders of . . . Cortez and . . . Ocasio, that is, a continuity between them based on time, *or* that there was a plan, motive, or intent common to both murders. If you find beyond a reasonable doubt that the state has proven that the defendant committed two murders as part of a single course of conduct with a clear connection, then you shall find this element of murder with special circumstances to have been proven." (Emphasis added.) Defense counsel did not object to the court's instruction on murder with special circumstances.

As an initial matter, we conclude that, under the

circumstances of this case, the court did not provide the parties with a meaningful opportunity to review the change it had made to the instruction on the "in the course of a single transaction" element of murder with special circumstances before charging the jury. As previously indicated, the court first discussed that change, among others, with the parties during a brief morning recess on the day that it charged the jury. Although the court provided the parties with a copy of the revised jury charge prior to the morning recess, the parties did not have a meaningful opportunity to review that charge before the morning recess because of the various trial activities conducted that morning. When the court finally discussed its changes during that morning recess, the parties ability to focus on each change highlighted for them by the court was undoubtedly limited by the fact that they would begin their closing arguments immediately following the recess. Moreover, although the court gave the parties the luncheon recess to review the changes, we do not believe that this was a sufficient allotment of time for the parties to review meaningfully each of those changes, particularly the change to the instruction on the "in the course of a single transaction" element, a technical change warranting this court's review on appeal, and *State* v. *Campbell*, supra, 328 Conn. 444, on which the court had based its change to that instruction. See *State* v. *Lavigne*, 307 Conn. 592, 597 n.4, 57 A.3d 332 (2012) (concluding that defendant did not implicitly waive instructional error claim in lengthy and complex trial when defense counsel had approximately ninety minutes to review court's proposed instructions between conclusion of testimony and beginning of charging conference); see also *State* v. *Kitchens*, supra, 299 Conn. 495 n.28 ("[h]olding an on-the-record charge conference, and even providing counsel with an advance copy of the instructions, will not necessarily be sufficient in all cases to constitute waiver of *Golding* review if defense counsel has not been afforded adequate time, under the circumstances, to examine the instructions and to identify potential flaws"). But cf. *State* v. *Webster*, 308 Conn. 43, 63, 60 A.3d 259 (2013) (concluding that defense counsel, who was given opportunity to review proposed jury instructions overnight following closing arguments, had, under *Kitchens*, "meaningful opportunity" to review those instructions). Accordingly, we conclude that the defendant did not waive implicitly his instructional error claim and turn now to the merits of that claim.

"It is well established that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . Moreover, [i]f justice is to be done . . . it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime. . . . Nevertheless, [t]he charge is to be read as a whole

and individual instructions are not to be judged in artificial isolation from the overall charge. . . . In reviewing the charge as a whole, [the] instructions need not be perfect, as long as they are legally correct, adapted to the issues and sufficient for the jury's guidance. . . . The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Blaine*, 334 Conn. 298, 308, 221 A.3d 798 (2019).

In *State* v. *Gibbs*, supra, 254 Conn. 601, this court considered whether the state had proved the "in the course of a single transaction" element of capital felony; General Statutes (Rev. to 1991) § 53a-54b (8) (now murder with special circumstances); despite the fact that it had not presented evidence of temporal proximity between two murders. In that case, the defendant, David A. Gibbs, went to the home of his former girlfriend and her mother to murder both women over their failure to repay money that Gibbs claimed they owed him. *State* v. *Gibbs*, supra, 581–82. Only the mother was home when he arrived, and, after killing her, Gibbs waited until his former girlfriend returned the next day, at which time he killed her. Id., 582–83. On appeal, Gibbs argued that the state was required to present evidence of a temporal nexus between the murders to establish the elements of the offense of murder of two or more persons in the course of a single transaction, while the state contended that it had to prove only that there was some nexus between the murders, which it claimed to have done by presenting evidence that the murders were connected by a common purpose or plan. Id., 601. This court agreed with the state, explaining that "[a] single transaction is a series of events with a temporal continuity or clear connection." (Emphasis omitted; internal quotation marks omitted.) Id., 603, quoting *In re Michael B.*, 36 Conn. App. 364, 380, 650 A.2d 1251 (1994); see also *State* v. *Campbell*, supra, 328 Conn. 501 ("[t]o constitute a single transaction . . . there must be some clear connection between the murders, so that they may be viewed as part of a series of related but separate events" (internal quotation marks omitted)). The court noted that, although "the relationship [between the separate events] often is a temporal one . . . [that] does not categorically foreclose the possibility that a 'clear connection' between [multiple] murders may be established by some other type of nexus." *State* v. *Gibbs*, supra, 603. Accordingly, the court held that, "although a temporal nexus between multiple murders committed by a defendant may constitute evidence that those murders took place in the course of a single transaction, such a temporal relationship is not an absolute prerequisite to prosecution under [the murder with special circumstances statute]. Rather, the nexus between multiple murders necessary to prove that those murders took place in the course of a single

transaction also may be established by proof beyond a reasonable doubt that a defendant possessed a plan, motive or intent common to the murders." Id., 606.

Contrary to the defendant's assertion, this court did not hold in *Gibbs* that evidence of a common plan, motive, or intent was required to prove that multiple murders occurred in the course of a single transaction. We held, rather, that, in the absence of a temporal connection, evidence of a common plan, motive, or intent was sufficient to demonstrate a clear connection between the murders and, thus, to establish that they occurred in the course of a single transaction. Id. In reaching that determination, we also made clear that evidence of a temporal connection alone was sufficient to satisfy the single transaction element. Id., 603 ("a temporal nexus between multiple murders committed by a defendant may constitute a capital felony"); see id. (noting that relationship between separate events occurring in single transaction "often is a temporal one"); id., 606 ("temporal nexus between multiple murders committed by a defendant may constitute evidence that those murders took place in the course of a single transaction").[10] We therefore agree with the state that the trial court did not incorrectly instruct the jury that it could find the "in the course of a single transaction" element proven by evidence of a temporal nexus between the victims' murders. Accordingly, the defendant's claim of instructional error fails under the third prong of *Golding*.[11]

## II

The defendant next claims that the trial court improperly failed to provide the jury, sua sponte, with a special credibility instruction concerning Opalacz' testimony. Specifically, the defendant argues that "special credibility instruction[s] [have] roots in the concern that certain witnesses have such a powerful motive to testify falsely that the court should warn jurors to consider carefully their testimony" and that, because the defendant presented evidence that Opalacz possessed the motive, means, and opportunity to kill the victims, the court should have provided a special credibility instruction with respect to her testimony. The state argues that, because the defendant's claim is not of constitutional magnitude, it fails under the second prong of *Golding* and is reviewable only for plain error. The state further argues that this court should reject the defendant's claim of plain error because Opalacz does not fit within any of the existing exceptions to the general rule that a defendant is not entitled to an instruction singling out a state's witness and highlighting their potential motive to testify falsely, and because it is not plain error for the trial court to fail to provide the jury, sua sponte, with a special credibility instruction that has not previously been recognized, let alone required, by Connecticut appellate courts.

We agree with the state that the defendant's claim fails under the second prong of *Golding* because this court repeatedly has held that the failure of a trial court to provide a special credibility instruction is not of constitutional magnitude. See, e.g., *State* v. *Patterson*, 276 Conn. 452, 471, 886 A.2d 777 (2005) (holding that, for purposes of harmfulness analysis, trial court's improper failure to provide jury with special credibility instruction for witness who was jailhouse informant was not constitutional in nature); *State* v. *Brown*, 187 Conn. 602, 613, 447 A.2d 734 (1982) (holding that trial court's failure to give accomplice credibility instruction to jury does not involve violation of constitutional right); *State* v. *Cooper*, 182 Conn. 207, 212, 438 A.2d 418 (1980) (same for complaining witness credibility instruction); see also *State* v. *Diaz*, 302 Conn. 93, 99 n.3, 25 A.3d 594 (2011) ("[t]he defendant concedes that the trial court's failure to give [sua sponte] a special credibility instruction was not of constitutional magnitude and, therefore, his claim does not qualify for review under [*Golding*]").[12] Accordingly, we conclude that the defendant's claim is reviewable only for plain error. We further conclude that the court's failure to provide the jury, sua sponte, with a special credibility instruction concerning Opalacz' testimony does not constitute plain error.

The following procedural history is relevant to this claim. On October 26, 2018, during its summary of the in-chambers charging conference it had conducted with the parties, the trial court stated that it would provide the jury with a third-party culpability instruction identifying the defense's theory that Opalacz, not the defendant, murdered the victims. The court further stated that, although it had considered providing the jury with an accomplice credibility instruction concerning Opalacz' testimony, it would not do so "because [that instruction] is contrary to the [defense's] theory" that Opalacz was not an accomplice but rather the principal. Defense counsel agreed with the court's decision not to provide an accomplice credibility instruction for Opalacz and did not otherwise request a special credibility instruction concerning her testimony. During its charge to the jury, the court provided a third-party culpability instruction,[13] a general credibility instruction,[14] and a specific instruction concerning Opalacz' credibility as a witness who had pleaded guilty to, and had a pending sentencing hearing for, hindering prosecution with respect to the victims' murders.[15] Defense counsel did not object to the court's jury charge.

As previously stated, "a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law." (Internal quotation marks omitted.) *State* v. *Blaine*, supra, 334 Conn. 308. "The charge must be correct in the law, adapted to the issues and sufficient to guide the jury. . . . The primary purpose of the charge to the jury is to assist [it]

in applying the law correctly to the facts which [it] find[s] to be established." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 466. "Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . This court has held, however, that a special credibility instruction is required for three types of witnesses, namely, complaining witnesses, accomplices and jailhouse informants." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Diaz*, supra, 302 Conn. 101–102. As set forth in footnote 6 of this opinion, "[an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 597, 134 A.3d 560 (2016).

In *State* v. *Diaz*, supra, 302 Conn. 93, this court considered a claim "that the trial court committed plain error when it failed to instruct the jury, sua sponte, that it must consider with great caution the testimony of [three witnesses], in light of their involvement in the criminal justice system and the possibility that they would receive some benefit from the government in exchange for their testimony." Id., 99. The defendant in *Diaz* argued that *State* v. *Patterson*, supra, 276 Conn. 469–70, and *State* v. *Arroyo*, 292 Conn. 558, 569, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), in which this court required that a special credibility instruction be given for jailhouse informants, should be extended to "any witness who is in a position to receive a benefit from the state, even if the witness is not a classic jailhouse informant." *State* v. *Diaz*, supra, 99. This court rejected the defendant's claim of plain error, concluding that for two of the three witnesses, to whom the defendant conceded that the jailhouse informant instruction did not apply because they testified about events surrounding the crime that they had witnessed outside of prison, "the trial court's failure to give a special credibility instruction concerning [their] testimony . . . pursuant to *Patterson* or *Arroyo* would not have been improper even if the defendant had requested such an instruction. A fortiori, its failure to do so sua sponte did not constitute an error that was so obvious that it affect[ed] the fairness and integrity of and public confidence in the judicial proceedings, or of such monumental proportion that [it] threaten[ed] to erode our system of justice and work a serious and manifest injustice on the aggrieved party." (Internal quotation marks omitted.) Id., 104.

In the present case, the defendant claims that the court committed plain error by failing to provide the jury, sua sponte, with a special credibility instruction

for Opalacz because evidence was presented at trial that she murdered the victims and, thus, had a strong motive to testify falsely against the defendant. Similar to the defendant in *Diaz*, the defendant here seeks a novel exception to the general rule against singling out a witness and highlighting the witness' motive to testify falsely. See id. (defendant conceded that requiring special credibility instruction for two witnesses who were not jailhouse informants "would be an expansion of *Patterson*"). The defendant failed to request that the court provide such an instruction, but, even if he had done so, it would not have been plain error for the court to decline to provide it, as this court has yet to endorse, let alone to require, trial courts to provide such an instruction. See id., 104 n.8 ("[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine"). But cf. *State* v. *Moore*, 293 Conn. 781, 824, 981 A.2d 1030 (2009) (concluding that trial court's failure to provide accomplice credibility instruction was "plain or readily discernible error" because this court previously had held that "[when] it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony [of accomplice witnesses]" (emphasis in original; internal quotation marks omitted)), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). A fortiori, as in *Diaz*, the trial court's failure to provide the instruction, *sua sponte*, cannot constitute plain error.[16] Moreover, because the court instructed the jury on Opalacz' credibility; see footnotes 14 and 15 of this opinion; and because the defense, during cross-examination and in closing argument, highlighted for the jury Opalacz' motivations for testifying falsely, including its theory that she was the actual and sole perpetrator of the victims' murders, we further reject the defendant's plain error claim. See *State* v. *Diaz*, supra, 302 Conn. 103 ("trial court's failure to give, sua sponte, a jailhouse informant instruction pursuant to *Patterson* [did] not constitute plain error when the trial court ha[d] instructed the jury on the credibility of witnesses and the jury [was] aware of the witness' motivation for testifying").

### III

The defendant's final claim is that the trial court violated his state and federal constitutional rights to counsel and to present a defense by precluding defense counsel from arguing in closing argument that the absence of testimony from Velez created reasonable doubt. Specifically, the defendant argues that the trial court incorrectly determined that defense counsel was making a missing witness argument under *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), overruled in part by *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000),[17] because he

did not encourage the jury to speculate that, had the state called Velez as a witness, her testimony would have been unfavorable to the state. The defendant asserts that defense counsel was, in fact, arguing that the state's theory that he killed Cortez because of a dispute over " 'fake weed' " was not credible and that, in advancing that argument, defense counsel merely was asking the jurors whether, in assessing each parties' theory of motive, "they [would have] want[ed] to hear from Velez about the feud between Opalacz and the victims." We review the defendant's claim under *Golding* because the record is adequate and the claim is of constitutional magnitude. See, e.g., *State* v. *Santiago*, 305 Conn. 101, 207–208, 49 A.3d 566 (2012) (reviewing under *Golding* defendant's claim that "the [trial court's] curative instruction abridged his constitutional right to present a summation in a criminal jury trial"), superseded in part, 318 Conn. 1, 122 A.3d 1 (2015).

In response, the state argues that the trial court did not violate the defendant's constitutional rights to counsel or to present a defense because the court "reasonably concluded that . . . [defense counsel] was insinuating that the state did not want the jury to hear from Velez because she was best friends with Ocasio, with whom Opalacz had a feud, and her testimony would have bolstered the [defense's] theory that Opalacz shot the victims." (Emphasis omitted.) The state further argues that the court did not prevent defense counsel from arguing to the jury the existence of reasonable doubt or the defense's third-party culpability theory based on evidence adduced at trial of the feud between Opalacz and Velez. We agree with the state.

The following procedural history is relevant to this claim. During his closing argument, defense counsel asked the jury: "What about . . . Velez? . . . [B]est friends with . . . Ocasio. Ask yourself, didn't you want to hear from her in this trial?"[18] Before defense counsel could proceed any further with this argument, the prosecutor objected. The trial court sustained the objection, stating, "[t]hat's [an] improper argument," and defense counsel responded that he was "[m]oving on." After defense counsel concluded his closing argument, and outside the presence of the jury, the court stated that it had sustained the state's objection because it believed that defense counsel was making a missing witness argument in violation of *State* v. *Malave*, supra, 250 Conn. 722. The court also noted that, on a page of a flip chart utilized by defense counsel during his closing argument, there was reference to Velez' absence from the trial, which it felt had "compound[ed] the problem." The court stated that defense counsel's argument was "particularly inappropriate . . . given the fact that the record will reflect that . . . yesterday . . . Velez was here under defense subpoena, was ready to testify, and [the] defense chose not to put her on." The court declined to provide a curative instruction but invited the

prosecutor to respond to defense counsel's argument during the state's rebuttal argument. The prosecutor did so, stating that, "when [defense counsel asked] wouldn't you have liked to have heard from . . . Velez, that was improper argument. You're not allowed to speculate as to why . . . Velez did not testify. And you should know that both sides are free to call witnesses." Defense counsel did not object to the state's sustained objection to his closing argument, the court's permission to the prosecutor to respond to his "improper argument," or the prosecutor's particular response during the state's rebuttal argument.

The following legal principles guide our analysis of this claim. "[T]he right to the assistance of counsel ensures an opportunity to participate fully and fairly in the adversary [fact-finding] process. . . . The opportunity for the defense to make a closing argument in a criminal trial has been held to be a basic element of the adversary process and, therefore, constitutionally protected under the sixth and fourteenth amendments. . . . Closing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case. Only then can [counsel] . . . argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. . . .

"[T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter[s] that might prejudice its deliberations. . . . While we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Citation omitted; internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 305–306, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

We conclude that the trial court reasonably determined that defense counsel was making an improper missing witness argument, rather than "raising a significant issue"; id., 306; or making appropriate comment about Velez' absence insofar as her absence reflected on the weakness of the state's case. See *State* v. *Malave*, supra, 250 Conn. 739. Velez was not a witness to the events on May 16, 2016, that surrounded the victims' murders and, thus, could not corroborate or dispute the version of events to which Opalacz, Rodriquez, and

Villegas testified. Furthermore, it was the defense, not the state, that initially sought, yet later declined, to call Velez as a witness. See footnote 18 of this opinion. Accordingly, it was reasonable for the court to conclude that, when defense counsel asked the jury, "[w]hat about . . . Velez? . . . [B]est friends with . . . Ocasio. Ask yourself, didn't you want to hear from her in this trial?" he was not identifying a weakness in the state's case but was, in fact, inviting the jury to speculate that the state declined to call Velez as a witness because, as Ocasio's best friend, she would have provided unfavorable testimony to the state by, for example, supporting the defense's theory that Opalacz murdered the victims. But cf. *State* v. *Ross*, 18 Conn. App. 423, 431, 433–34, 558 A.2d 1015 (1989) (holding that trial court improperly restricted defendant's right to present closing argument by precluding his argument that failure of witness who "was the sole eyewitness to the shooting" to testify created reasonable doubt in state's case). Moreover, there was ample testimony, without the need to discuss Velez' absence at trial, from which defense counsel was able to argue in closing argument that Opalacz had a stronger motive than the defendant, as well as the means and opportunity, to murder the victims. The reasonableness of the trial court's determination is further illustrated by the fact that defense counsel did not provide advance notice to the court or the prosecutor that he would be making a reasonable doubt argument based on Velez' absence; see *State* v. *Malave*, supra, 740; and that, when the court accused him of having made an improper missing witness argument, he did not argue to the contrary. Accordingly, we conclude that the court reasonably determined that defense counsel was making an improper missing witness argument and that it reasonably exercised its discretion by limiting the scope of defense counsel's final argument to prevent comment on facts that were not properly in evidence.[19] See, e.g., *State* v. *Joyce*, supra, 243 Conn. 305–306. The defendant's claim thus fails under the third prong of *Golding*.[20]

The judgment is affirmed.

In this opinion the other justices concurred.

* July 15, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of murder with special circumstances who is convicted of any of the following and was eighteen years of age or older at the time of the offense . . . (7) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[3] The trial court vacated the defendant's conviction on the murder counts pursuant to *State* v. *Roszkowski*, 329 Conn. 554, 563, 188 A.3d 139 (2018) (holding that, under *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013), trial court should have vacated defendant's three murder convictions, rather than merging them into corresponding capital felony convictions, as lesser included offenses of capital crimes).

[4] In November, 2016, Opalacz and Villegas were both charged with hinder-

ing prosecution in the second degree in violation of General Statutes § 53a-166 for their actions following the victims' murders. At the time of the defendant's trial, Opalacz pleaded guilty to that charge and was awaiting sentencing, and Villegas' case was pending. Following the defendant's trial, Opalacz was sentenced to ten years of imprisonment, execution suspended, and five years of probation, and Villegas pleaded guilty to interfering with an officer in violation of General Statutes § 53a-167a and was sentenced to one year of imprisonment, execution suspended, and three years of probation.

[5] Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

[6] "[T]he plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [This court previously has] described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice. . . . [O]ur review . . . with respect to plain error is plenary." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–97, 134 A.3d 560 (2016).

[7] In *Kitchens*, this court concluded that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, supra, 299 Conn. 482–83

[8] Instruction 5.5-1, titled "Capital Felony or Murder with Special Circumstance—§ 53a-54b," provides in relevant part: "The second element is that the *<insert number of murders>* murders occurred at the same time or in the course of a single transaction. In order to prove that the murders occurred at the same time or in the course of a single transaction the state must prove beyond a reasonable doubt that the murders occurred at approximately the same time or that the murders were related to a single course of conduct

or plan carried out as a series of events with a clear connection. Was there a plan, motive or [intent] common to the *<insert number of murders>* murders? If you find beyond a reasonable doubt that the state has proved that all of the murders occurred as part of a single course of conduct with a clear connection, then you shall find this element to have been proven." Connecticut Criminal Jury Instructions 5.5-1, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 13, 2021).

[9] Despite our conclusion that the defendant did not implicitly waive his right to challenge the trial court's instruction on appeal, we commend the court for having taken the time to draft the subtle change to the instruction on the "in the course of a single transaction" element that it deemed necessary as a result of its review of *State* v. *Campbell*, supra, 328 Conn. 444.

[10] Contrary to the defendant's assertion, our conclusion is not undermined by our statement in *Gibbs* that "[t]o construe the amount of time between the murders as *alone* controlling the issue of whether those murders took place in the course of a single transaction would render the first clause ['at the same time'] mere surplusage." (Emphasis added.) *State* v. *Gibbs*, supra, 254 Conn. 602. The defendant argues that, consistent with our reasoning in *Gibbs*, to construe the phrase "in the course of a single transaction" to include murders that occur at the same time but without evidence of a common plan, motive, or intent would render the second clause of § 53a-54b (7) superfluous. We disagree. As we have explained, in *Gibbs*, the issue before the court was whether the phrase "in the course of a single transaction" required proof of a close temporal nexus between the murders. *State* v. *Gibbs*, supra, 601. We concluded that it did not, explaining that the legislature's use of that phrase indicated an intent to make the murder of two or more persons a capital felony not only when the murders occur at the same time but also when they are part of a common plan, motive, or intent; id., 606; as was the case in *Gibbs*. Thus, we explained that, although a single transaction may be established by proof that there was a close temporal nexus between the murders, it also may be established by proof that there was a clear connection between them. Id., 603. Contrary to the defendant's assertion, however, there is nothing in the language or legislative history of § 53a-54b (7) to suggest that the phrase "in the course of a single transaction" was intended to apply only to murders that occurred in connection with a common plan, motive, or intent, or that the statute was intended to proscribe two conceptually distinct acts of murder—i.e., multiple murders that occur at the same time and those that occur in connection with a common plan, motive, or intent. We agree with the state that our analysis in *Gibbs* makes clear that the phrase "at the same time or in the course of a single transaction" in § 53a-54b (7) merely provides two different descriptions of the same prohibited conduct (the murder of more than two people), with the phrase "at the same time" conceptually subsumed within the meaning of "in the course of a single transaction . . . ." For example, if a motorcyclist were to shoot all the passengers in a vehicle because the driver had just cut him off on the highway, the murders would have occurred as part of a single transaction no less than if the killer, in exacting his revenge, had waited and murdered each of the passengers separately, over the course of several hours.

[11] Because we conclude that the defendant's claim fails under the third prong of *Golding*, we further conclude that his claim of plain error also fails. See *State* v. *Blaine*, supra, 334 Conn. 305 ("plain error review is reserved for only the most egregious errors" (internal quotation marks omitted)); see also *State* v. *Stephens*, 301 Conn. 791, 797, 22 A.3d 1262 (2011) (concluding that defendant's claims, which failed under the third prong of *Golding*, were "not entitled to the extraordinary relief available under the plain error doctrine").

[12] In arguing that "[t]he compelling facts of [his] case [warrant an] exception to the general rule that the failure to give [a special credibility instruction] is not constitutional error," the defendant cites to *State* v. *Baltas*, 311 Conn. 786, 91 A.3d 384 (2014), in which, he contends, this court applied the constitutional standard for assessing harmfulness following its conclusion that the trial court improperly failed to provide a special credibility instruction. The defendant misreads *Baltas*, which explicitly states that the defendant in that case did not claim "that the trial court's failure to instruct the jury on [a witness'] motive to testify falsely violated any of his constitutional rights, [and, thus, he bore] the burden of demonstrating that the court's error was harmful." Id., 822; see also *State* v. *Cody M.*, 337 Conn. 92, 113 n.17, 259 A.3d 576 (2020) ("[i]f the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond

a reasonable doubt" (internal quotation marks omitted)).

[13] The court instructed the jury on third-party culpability as follows: "The defendant has offered evidence that a third party . . . Opalacz, and not the defendant, committed the crimes with which the defendant is here charged. This evidence is not intended to prove the guilt of the third party but is part of the total evidence for you to consider. The burden remains on the state to prove each and every element of the offense, including identification, beyond a reasonable doubt. It is up to you and to you alone to determine whether any of this evidence, if you choose to believe it, tends to directly connect . . . Opalacz to the commission of the crimes with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that . . . Opalacz may [be] the individual who committed the crimes that the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the defendant before you."

[14] The court instructed the jury on witness credibility in general in relevant part: "[I]n deciding what the facts are, you must consider all the evidence and decide which testimony to believe and which testimony not to believe. You may believe or disbelieve all, none, or any part of any [witness'] testimony. In making that decision, you may take into account a number of factors, including . . . did the witness have any interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case? . . .

"You should size up each witness and then make your own judgment as to his or her credibility and decide what portion, all, some or none of any particular [witness'] testimony you will believe. You should use all of your experiences, your knowledge of human nature, and of the motives which influence and control human conduct, and you should test the evidence against that knowledge."

[15] With respect to Opalacz' testimony, the court instructed the jury on her credibility as a state witness with pending criminal charges as follows: "Now, evidence has been presented that the [witness] . . . Opalacz . . . [was] arrested by [the] police in November of 2016, on the charge of hindering prosecution in the second degree, a felony punishable by up to ten years in prison, for engaging in actions that the state claimed hindered the prosecution of the crimes that are [the] subject of the case now before you. . . . Opalacz had pleaded guilty to that crime and is awaiting sentence. . . . You may consider this evidence in determining the credibility of the [witness], that is, on the issue of the weight that you will give [her] testimony and in determining whether [her] testimon[y] should be believed wholly, partly, or not at all. You should keep in mind that [she], by cooperating with the state, may be looking for more favorable treatment in her ultimate sentencing. . . . As to [this witness], you should, therefore, consider whether she may have an interest in the outcome of the case now before you and the extent to which, if at all, that interest may have colored the testimony she has given.

"Of course, it is important for you also to keep in mind . . . that many, if not most, crimes are of such a nature and are committed under such circumstances that the only persons capable of giving useful testimony as to what occurred are those who may have themselves engaged in some type of criminal conduct at or around the time of the commission of the crime about which they have given testimony. So, for that reason, you must give due consideration to the testimony of . . . Opalacz . . . during your deliberations.

"In the final analysis, it is for you to decide whether you believe or disbelieve the testimony of . . . Opalacz in whole or in part . . . . You should give such weight to these facts that you decide is fair and reasonable in determining the credibility of [Opalacz]. Like all other questions of credibility, this is a determination that you must make based on all the evidence presented before you."

[16] Although we express no opinion on the defendant's proposed special credibility instruction for a witness who may have committed the crime with which a defendant is charged, we reiterate, as we did in *Diaz*, that "it is within the discretion of a trial court to give a cautionary instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel. In determining whether to give such an instruction, the trial court may consider the circumstances under which the witness came forward; the seriousness of the

charges with which the witness has been charged or convicted; the extent to which the state is in a position to provide a benefit to the witness and the potential magnitude of any such benefit; the extent to which the witness' testimony is corroborated by other evidence; the importance of the witness' testimony to the state's case; and any other relevant factor." *State* v. *Diaz*, supra, 302 Conn. 113.

[17] "This court articulated the missing witness rule in *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675, which had held that [t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . [T]he jury charge explaining the [missing witness] rule commonly is referred to as the *Secondino* instruction or the missing witness instruction. . . . The legislature abandoned the missing witness instruction in civil cases by adopting General Statutes § 52-216c." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, 305 Conn. 101, 206 n.96, 49 A.3d 566 (2012), superseded in part, 318 Conn. 1, 122 A.3d 1 (2015).

In *State* v. *Malave*, 250 Conn. 722, 730–38, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), this court, for reasons of policy, abandoned the missing witness rule in criminal cases. In so doing, however, the court noted that it "[did] not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . So long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence, the argument does not fall within the *Secondino* rule, and our holding . . . does not forbid it. . . . Fairness, however, dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because comment on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case. Of course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue." (Citations omitted; footnotes omitted.) Id., 739–40.

[18] On October 29, 2018, the trial court stated on the record that, although the defense initially expressed an intention to call Velez as a witness and that she was "in the building" under a defense subpoena, defense counsel since had indicated to the court off the record that the defense had decided "as a matter of tactics and strategy" not to call her as a witness. Defense counsel confirmed the court's summary of the off-the-record discussion and agreed to excuse Velez from the defense subpoena.

[19] The defendant also argues that the trial court improperly (1) instructed the jury not to consider defense counsel's " 'improper argument' " and that it could not find reasonable doubt in the failure to hear from Velez, and (2) permitted the state to argue in closing argument that defense counsel could have called Velez as a witness, which he contends unconstitutionally "shifted the burden of proof to the defense . . . [and] dilute[d] the reasonable doubt standard . . . ." (Citations omitted.) We reject these arguments because the court properly instructed the jury not to consider defense counsel's speculative missing witness argument and because the state's argument that "both sides are free to call witnesses" was not tantamount to arguing that the defense was *required* to produce evidence of his innocence. The court, moreover, instructed the jury that "[t]he defendant does not have to prove his innocence," an instruction that we presume the jury followed. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 131, 836 A.2d 224 (2003) ("[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them"), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

[20] As with the defendant's first claim, because this claim fails under the third prong of *Golding*, it also fails under the plain error doctrine. See footnote 11 of this opinion.